I'd like to reserve three minutes, I believe, for rebuttal. Try to keep track of your own time, and I'll try to advise you in three minutes. Okay, I'll try to do that. Thank you, Your Honor. I'm going to address the due process violations first, Your Honor. I think they started in the beginning of the case when Mr. Estrada was apparently given a notice to appear sometime while he was in custody, and that's at the exit of record, page 93. That notice to appear is very insufficient. It is not notice. On page 92, there is no time or place or hearing site or a date where the hearing would be. On the second page, a respondent is required to bring all of his own documents with him to the hearing and witnesses and affidavits. They must be certified if their documents is original. They have to be translated and certified. This makes it impossible for somebody to put on a hearing in this case when they're in custody and they don't have notice of the time, place, or place of the hearing. I would also note that the NTA says you will have an opportunity to present evidence on your behalf to examine any evidence presented by the government, and you will have the opportunity, a reasonable opportunity to make any application for defense. This notice to appear is a standard notice of appearance, no different than notice that appears issues in similar other cases. Is that right? That's right. And I think this is similar. I mentioned this to Mr. Manahan, to counsel. I haven't cited this case, but, Your Honor, it's your case, I believe, Judge Reinhart, Walters v. Reno, where the notice was so inadequate to the respondents that if they admitted to their document fraud that they would be deported. They were misled to think that they would have a hearing on the document fraud, and I believe they weren't given notice that they would be deported and they weren't given a time or a place for the hearing. It's the same thing. And if this is being used in a mass way where every respondent is getting it, I think that's a big institutional problem. But for purposes of Mr. Estrada's case, it certainly is not notice. There's no way he could get his witnesses or the massive numbers of medical documents, educational documents he had, many of them which are in Spanish. If you look at the exit of record pages 202 to 218, which are mostly his scholastic records, almost all of them are written in Spanish. Can you imagine the family, this family having to pay to get those certified and translated? Did he ever ask for an extension? Did he ask for an extension? No. He was told by the immigration judge, if you're not going to get an attorney ñ well, I referenced page 105. The immigration judge had determined that nobody at this hearing was going to get an attorney. And he said, okay, after that I will ask you if you have any witnesses, papers, or documents. You know or tell me about it. Anything you wanted to say as a defense to your case. You have the right to show me anything that you have a right to say in this country. If you have anything you want to say about your case concerning your legal right to be here or anything else, don't be afraid to speak out at that time. That is your only chance. If you read this in concert with his waiver of counsel, his mass waiver of counsel he got from the six respondents, what this immigration judge is saying, if you're not going to get an attorney, I'm not going to put over your hearing. I'm going to have it right now. Without telling them that they could have the chance to have their own hearing where they represent themselves pro se. It's like the Jacinto case that I cited in both of my briefs. In that case, your court reversed the immigration judge because the immigration judge did not tell that pro se alien that she could not only present her own documents, but she could speak without being interrogated by the IJ. She could speak in a narrative form. She could bring her own witnesses. She didn't need to have a lawyer. She had the right to know what her rights were, what her procedural rights were, and what her potential defenses were. So this judge never once made any sound about voluntary departure. He said nothing about cancellation of removal. He said nothing about any kind of defense. You're talking about the March hearing, right? Yes. Okay. So I think the due process is...  The question is whether he could have received voluntary departure as a defense. But could he have received voluntary departure? At a second time, yes, he could. And again, I've cited many cases, Your Honor, that say he was admissible. I think what's important here is to make sure that we read the two statutes because you're required to read them together. And those are at, excuse me, page 8 of my response brief. First, you reference Title 8, Section 1229CC. The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found admissible under Section 1182A6A. And what I think the government doesn't do for you, Your Honor, which I've tried to do at page 8 and so forth in my reply brief, is I spell out 1182A6A. It specifically says, An alien present in the United States without being admitted or paroled or who arrives in the United States at any time or place other than as designated by the Attorney General is inadmissible. Mr. Estrada had long been admitted to the United States because of his eligibility under the FUP program. That's one reason. Because of his eligibility under the FUP program, which I can find other cases for you. But at the time that he appeared for his January hearing, he had already been convicted of the felony offense, right? The question was, was he inadmissible. No, he had already been admitted because as a FUP beneficiary under all the Ninth There's another reason why he's already admitted. He was admitted in 1991 when he was 11 years old when his mother became a lawful permanent resident. The same FUP cases that I'm about to cite for you in a second say that a person who becomes a FUP beneficiary is basically the same as a person who becomes an LPR. The day they become a lawful permanent resident, they're admitted. And it's the same for FUP beneficiaries. And children, that admission is imputed to children. And on page ER, my excerpt of records of 161, Mr. Estrada's mom swears that she became a permanent resident in 1991. So that is the day that he became admitted. And I can cite these cases. Cuevas Gaspar v. Gonzalez. And that's from this court in 2005. When parents of a FUP beneficiary become lawful permanent residents, non-emancipated minors become admitted. Was he charged with entering without inspection in November of 2001? Okay, that's a good question. Let's look at the NTA on excerpt of record. The first one, on page 79, that's from the first hearing. It's the notice to appear for the very first hearing in January. The allegations are that he was an arriving alien. He's an alien present in the United States who hadn't been admitted. He'd been admitted to the United States but are deportable. And then the factual allegations are that he's not a citizen or a national and that he's a national of Mexico and a citizen of Mexico. And he entered the United States at San Ysidro on or about September 4th, 1985. Now, I understand the government's argument is he is therefore inadmissible under a case called Gutierrez. The NTA, I believe, is basically charged wrong. Even if he's charged right or wrong, that's what he admitted, isn't it? He didn't. I think he admitted that he may have come in in 1984 as a 4-year-old without admission. That's not even clear. But once he became a FUP beneficiary, he was admitted. Or his mother became a permanent resident. On January 15, 2002, he was represented by a lawyer named William Baker? Yes. And didn't he admit that he was inadmissible? That's on page, I guess, he said, I'm going to find that in a second, Your Honor. If he said exactly he was inadmissible, he either meant he came in when he was not admitted as a child, or if he did say he was inadmissible, he's wrong. It's as if as I sat here and you were a district court and you asked me, is your client a felon? And I say, yes, my client's a felon, when, in fact, my client has no felony record. He's got a misdemeanor. But we can't proceed on the notion that my client's a felon because he's not. And if his lawyer said, oh, he's inadmissible for purposes of getting a second voluntary departure later on. Well, the result of this admission when he was represented by Mr. Baker was that he was then removed that day, wasn't he? He wasn't removed that day. He received a voluntary. He left that day and then came back that day. He was he received a voluntary departure on January. 15. 15. And they're alleging he came back that same day. And so he went into proceedings again on March 25th, which he only received notice of on March 15th, without any time, date or place. And the question is, was he eligible for a second grant of voluntary departure? The key is this. That was the question Judge Reinhardt started with. And I still don't get why he would be eligible for a second one if he's already got one left and then came back without inspection. Because the question is, under 1182.6a, an alien present in the United States without being admitted doesn't get one. He'd been admitted. He had been admitted as a ---- Before his prior deportation. He wasn't deported before. Before his prior voluntary departure. He had been admitted. And the crux of this case, compared to all the other ones, the Alcantara, Vasquez Alcantaras, and the Garcia-Cuevas-Gasparas, Mr. Estrada was in the country when he was placed into removal proceedings in January. He was an admitted alien. He was just as if you were a lawful permanent resident who was told, oh, you committed a crime on Colorado Boulevard. We're bringing you into court, into immigration court. We're alleging you're removable. But he'd already been admitted. There was no finding the person's not admissible. The finding is whether he was removable. That's the real issue. Was he removable? And he wasn't removed. He was ordered deported. But he was never found inadmissible because he wasn't admissible. He'd already been admitted years ago. He was just like a lawful permanent resident. He's already admitted. In the cases where, I think the Fifth Circuit case where the person is said to be inadmissible the first time, so he couldn't get a second grant of voluntary departure, what happened was the first time he came to the border in Texas, and the border patrol voluntary departed him because he had an egg felony on his record. Then he came back again, and they said, or he had some kind of felony or something on his record. In any event, he was inadmissible the first time because he was arriving at the border. This is just like, this is very different from Mr. Estrada. He was already in the country, and he'd already been admitted. It was as if you had a lawful permanent resident who was on bond and came into immigration proceedings. He'd been admitted, so there was, he had not, he was allowed a second grant of voluntary departure. Do we know whether his eligibility or benefits under the FUP program was ever officially revoked? I have no, I don't see that at all. I see no adjudication of that, no final order, no nothing. I will add this as well. It's not just voluntary departure that he was eligible for. There's another prejudice. That this circuit has said recently in a case that another form of relief from deportation is withdraw your application for admission. That case comes out of San Francisco where the man arrived at the San Francisco airport, and he had something on his record that made him inadmissible. And the immigration authorities and the judge allowed him to withdraw his request to enter and get off the plane and come into the country. That's exactly what should have happened in this case. And Mr. Estrada, basically, it sounds like he was asking that at the border and with the judge, look, let me go back and I'll fix my papers. And the judge could have told him, oh, okay, I can authorize you to withdraw your application, and I'll grant that. And so he would never have made an attempt to enter, and he doesn't need to be ordered deported. That is another form of relief. It is plausible he could have gotten it under AREA that there's no reason why the judge couldn't have granted that. You're way over your time, I see. Okay. Thank you. George Madian, United States. May it please the Court. As the Court noted in some of its questions, on the March 2002 immigration hearing, Mr. Estrada had already been granted voluntary departure after he conceded that he was inadmissible under Section 1182A6A. That is exactly what the – what stops you from being allowed to be granted a second voluntary departure under Section 1229C subsection C of Title VIII. Therefore, there was no prejudice, regardless of any due process errors, that could conceivably have been found in the second deportation hearing. I think what he's arguing is that that concession that he was inadmissible was in error because of his status as an FUP beneficiary. Neither the grant of Family Unity Program benefits nor the fact that while you're on the Family Unity Program, you're sometimes, which Mr. Estrada was, given leave to go back and forth between Mexico and the United States, grants you admissibility. Rather, what the statute that implements the Family Unity Program says, and this is found as a note at – on Section 1255A, that the grant of Family Unity Program benefits is a temporary stay of deportation. It's a two-year stay, and you can renew it. But it's not – it doesn't magically make you admissible. It's contrary. It's the whole logic of what the Family Unity Program is, which is, okay, you came in illegally. Your parent becomes a legal permanent resident. Maybe you want to apply to become a legal permanent resident now because of that. We're going to – instead of kicking you out and then having to apply, we're going to let you stay so the family can stay together. Now, obviously, that doesn't mean that you then – you were then admitted. It just means we're giving you some time to fill out your application. But unfortunately for Mr. Estrada, he committed a drug possession offense, which statutorily made him eligible for the benefits of Family Unity Program. But the regulations governing the Family Unity Program does have a process for revoking benefits under that program. Was that process ever complied with in his case? The process was complied with when they granted him the notice to appear saying, we're now going to find you removable. I don't know that there's any other process that's required. I mean, the felony offense automatically excluded him for benefits from the Family Unity Program. And the United States basically let him know, hey, you're not getting those benefits anymore by giving him a notice to appear saying, we're now going to remove you from the United States. I thought it said that when – on the determination of the Attorney General, that it terminates when the Attorney General determines that you've been convicted of a felony or of a certain offense. I'm sorry. I missed that question. Can you repeat it, Your Honor? I thought that under the Family Unification Program, it said that it terminates when the Attorney General determines that you have been convicted of the type of offense that's involved. The only type of offense that's required to terminate benefits – No, whatever type of offense it is, I thought there was a requirement that the Attorney General determine that you have been convicted of that type of offense. I don't know whether that's a separate determination or that's made at the immigration hearing. I don't believe it's a separate determination. The Attorney – the notice to appear is which he – well, the government attorney at the January 2002 deportation hearing clearly indicated Mr. Strada's felony offense, which is all that was required to terminate him. So the government certainly had determined that he was a felon and, therefore, ineligible for the Family Unification Program, which kind of makes sense since the whole point was they're trying to kick him out. So it's not usual that these termination proceedings take place. Once you're convicted of a felony or other offenses that renders you ineligible for benefits under the Family Unity Program, that's it. You're done. Then you go before an immigration judge where the determination is made. I mean, there's nothing automatic that happens. I mean, there's no double requirement for a hearing. You don't have to have an immigration judge hearing and another hearing to determine that you're a felon. What do you make of Ms. Vader's point that the notice to appear is defective? Well, this is an appeal of a 1326d motion. So clearly, even if there was a defect, there has to be some prejudice. Right. What about her broader point that it's defective? I would – I don't think there's any case law showing that it's defective. It clearly indicates that you have an attorney. It says – I mean, it's such a broad point. Is there any specific part of the notice? She says it doesn't put the date you're supposed to show up. And it didn't say what you're supposed to bring. Yes. And now she was talking about the second hearing. And that's on, I believe, on page 93 of the excerpt's record. Mr. Estrada actually requested a prompt hearing and waived his right to any period to appear. So there was no prejudice in that. He's basically saying, I want a hearing as soon as possible. Yeah. Well, you said there's no prejudice. And I'm asking, what about her main point that, you know, leaving prejudice aside, there's something wrong with the document that ought to be fixed for the future? Okay. There's nothing wrong with not putting a date when the alien specifically waives his right to have any period of time and ask for an immediate hearing. So there's no error there. There's no problem with that issue. I mean, his signature is right there on page 93 of the excerpt's record, saying, I want it right now. What about advising him of what documents he needs to bring or the like? I think the notice to appear advises him that he should bring any documents he wants the immigration judge to consider, which is adequate. It also advises him that he can seek an attorney if he wants more advice. Judge Wynn asked if this is the standard form that's always used. And I think Ms. Bader said yes. And that is correct. Have there been any other problems with this form that have come up in other cases that you know of? I don't, Your Honor. But more to the point, I don't think there's any problems with this form for this case that affects any prejudice. But no. I mean, the position of the government is there's no problem with this notice to appear. And I'd be happy to continue to respond to any specific issues with the notice to appear you may have. First of all, I really would like to get to the point where there's another removal in 2006. And by this time, Mr. Strada is an aggravated felon. Now, the Ninth Circuit law is clear that that removal was a reinstatement, and a reinstatement cannot cure a due process defect in a previous removal order. But what this circuit has not yet, at least in a published decision, determined is, okay, but in the context of an appeal of a 1326d motion, why the normal analysis should continue. And it is the burden of the alien defendant to prove that he was prejudiced by any due process error, which Mr. Strada cannot, given his aggravated felony status. It was automatic and, you know, beyond doubt that when he was found in the United States in 2006 that he was going to be removed. And it is his burden to show that it's plausible that anything else would have happened. And I would These aggravated felonies were committed subsequent to the March hearing that's being challenged as defective. Right? So he wasn't an aggravated felon at the time of the March 2002 hearing. That is correct. This is a separate argument. Besides the fact that there was no error when he was first ordered removed in 2002 because he wasn't eligible for a second grant of voluntary departure. Suppose there was a prejudicial error then, if he hadn't committed a felony. Now, how does the new felony change the fact that the, that there was prejudice as of the time of the original hearing? Okay. And I want to be clear. Let's, for the sake of argument here, I'm going to say, let's say there was a clear due process error in 2002 when he was ordered removed. And he's not an aggravated felon at that time. Then in 2005, he's convicted of selling, of possessing methamphetamine for sale, a clear aggravated felon. Then in 2006, he's removed again by the process of a reinstatement of the original removal. That reinstatement, there's no doubt, did nothing to cure the defect in the original deportation order. However, what has changed is the status of Mr. Estrada. He's become an aggravated felon. And because of that, he can no longer meet his burden of proving that there was a plausible chance that anything other than his deportation was going to happen in 2006. To put it another way, a reinstatement, we all know, is just someone signing, you were removed once, we're going to remove you again. He's an aggravated felon. All they had to do was sign a different piece of paper that says, we're administratively removing you. That just goes to show why he was not possible, but he would show that he was prejudiced in 2006 when he was ordered to remove because of his aggravated felon status. Okay. Thank you. You're welcome. All right. We'll give you a minute for rebuttal. Okay. I think what you're addressing is if there was prejudice, well, and if you were inadmissible. All these cases that you have from this Court, Garcia-Quintero says that a FUP beneficiary is admitted. An LPR, a person who's not yet an LPR, who's just adjusting their status, has had an approved visa application but hasn't become an LPR, they are not admitted. But FUP members are admitted. So he was admitted. And if you are going to be concerned about whether there was an admission, that was ineffective assistance of counsel. But moreover, by the second hearing in March, there was a violation of Mr. Estrada's rights by not stopping the hearing and getting his attorney and allowing him to assert his right that had continued in the January hearing. He'd had an attorney. He was trying to seek post-conviction relief. There was no final say on what would happen with his prior conviction. And he had a right to have an attorney. The judge said nothing. He just said, when Mr. Estrada said, I will go back to Tijuana and I'll wait and see what my attorney does to fix my papers, at that point the IJ had a duty, statutory and constitutional, to stop and make sure and make the proper inquiries that this person was validly waiving his right to an attorney. The immigration judge knew that the minute he ordered Mr. Estrada deported and sent him back into Mexico, there was no way. He knew that an attorney would be useless then. He should have said and he should have advised him, you should stop and get your attorney now or postpone this and get some advice because it will be too late. He did not tell him the ramifications or the consequences of proceeding without an attorney, which ram requires, tawadris requires, everybody requires it. I also want to address all these cases that say one is admissible as a beneficiary. It's Garcia-Quintero, it's Vasquez de Alcantara, and it's Cuevas Gaspar. I also want to address his other possibility, plausible defense from deportation. And it's found in your case from this Court, United States v. Barajas Alvarado, 655 F. 3rd, 1077. It confirms that withdrawal of an application to enter is a form of discretionary relief. In this case, Mr. Estrada fits all the criteria. He only had one prior conviction. He had no removals against him. He did not use false documents or make a false statement at the border when he came in. He was trying to follow the laws. He did not know the law. He basically, it sounds like, asked at the border or said, I want to come in. And there are humanitarian and public interest considerations in allowing him to withdraw his application. Those would be that you want the courts to have some finality and to respect people's rights to have an attorney to try to defend themselves against deportation, which is exile. This was exiling a 19-year-old kid, basically, who was being returned to Mexico in a matter of one paragraph by this judge. So I think withdrawal is another excellent, plausible means of relief he had from deportation. Okay, counsel. Okay. Thank you. Thank you, Your Honor. Thank you. The case to target is submitted.
judges: Reinhardt, Silverman, Nguyen